**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREENLEAF 401K TRUST, by DR. NASRULLAH KHAN as TRUSTEE,** | ) | |
| **Plaintiff,** | ) | **No. 22-CV-6658** |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| **SENECA INSURANCE COMPANY, INC.,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Greenleaf 401K Trust, by Dr. Nasrullah Khan as Trustee ("Greenleaf"), brings this action against insurer Seneca Insurance Company, Inc. ("Seneca") following the 2022 demolition of a building insured under a policy that Seneca issued to Greenleaf. (Dckt. #1). Greenleaf seeks recovery under that policy up to its inflation-protected $200,000 policy limit, in addition to the $42,910 cost of demolition, 5% interest, and attorney's fees. (*Id.* ¶34). Greenleaf also seeks a declaratory judgment resolving a purported ambiguity in the policy. (*Id.* ¶42).

Before the Court is Seneca's motion for summary judgment, (Dckt. #63), in which it argues that it is entitled to judgment because: (1) Greenleaf cannot establish a covered loss during the policy period; (2) even if it could, Greenleaf's claims are excluded by three different and unambiguous policy exclusions; and (3) the policy offers no coverage for the $42,910 in demolition costs, (Dckt. #64). Greenleaf opposes Seneca's motion, arguing that: (1) Seneca asserts new coverage defenses that contradict each other and should be barred; (2) material disputes exist as to whether a collapse occurred within the policy period and whether any

collapse falls within an exception to the policy's exclusions; and (3) demolition costs are covered under the policy. (Dckt. #68).

For the reasons set forth below, the Court grants Seneca's motion for summary judgment. (Dckt. #63).

## I. PROCEDURAL BACKGROUND

On November 29, 2022, Greenleaf filed a lawsuit against Seneca asserting breach of contract, seeking recovery under its insurance policy and declaratory judgment resolving a policy ambiguity. (Dckt. #1). On January 30, 2023, Seneca filed a motion to dismiss, (Dckt. #9), which was denied by the Court on August 16, 2023, (Dckt. #17). Seneca filed its answer to the complaint on September 7, 2023, asserting seven affirmative defenses concerning provisions of Greenleaf's policy that limit or bar Greenleaf's recovery. (Dckt. #22).

After proceeding through fact discovery, Seneca filed the motion for summary judgment now before this Court on March 10, 2025. (Dckt. #63).

## II. LEGAL STANDARD

### A. Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Pfalzgraf v. Rusk Cnty., Wis.*, 187 F.4th 507, 512 (7th Cir. 2026). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact).

When the moving party has met its burden, the non-moving party cannot rely on "conjecture and conclusions" to concoct factual issues. *Johnson v. Ridge Tool Mfg. Co., Inc.*, 186 F.4th 478, 489 (7th Cir. Aug. 7, 2026). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. Of course, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

**B. Requirements of Local Rule 56.1**

Northern District of Illinois Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this District. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up). To this end, Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). In turn, Local

Rule 56.1(d) provides that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(2).

The non-moving party must then respond to the movant's statement of material facts. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). The response must consist of numbered paragraphs corresponding to the numbered paragraphs in the moving party's Local Rule 56.1 statement, and each response "must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." LR 56.1(e)(1)–(2). "A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." LR 56.1(e)(2). Instead, if the opposing party wishes to assert facts not set forth in the moving party's Local Rule 56.1 statement, it may submit a statement of no more than forty additional material facts, which also must comply with Local Rule 56.1(d). LR 56.1(d)(2), (5).

The Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011). Where a party fails to comply with Local Rule 56.1's requirements, the Court may exercise its discretion to accept the other party's properly supported statements of fact as undisputed. *See Curtis v. Costco Wholesale Corp.* 807 F.3d 215, 219 (7th Cir. 2015); *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014); *Daniels v. Janca*, No. 17 C 906, 2019 WL 2772525, at *2 (N.D.Ill. July 2, 2019) (collecting cases). In this matter, the Court placed the parties on notice at the pre-summary judgment conference that it would expect them "to comply with Local Rule 56.1," (Dckt. #66), and that the consequence of failing to do so could result in facts in the other side's statement of facts being deemed admitted.

Greenleaf's response to Seneca's statement of material facts, (Dckt. #69), falls short of the requirements of Local Rule 56.1(e). On thirteen occasions, Greenleaf attempts to dispute facts by disputing what Seneca "implies" or "suggests," setting forth new facts from different excerpts of the insurance policy or individuals' depositions in response. (*Id.* ¶¶26, 34–35, 40–41, 43, 47–48, 50, 52–54, 61). On ten occasions, Greenleaf attempts to dispute facts by questioning their accuracy, often by attacking the conclusiveness or credibility of deponents' testimony. (*Id.* ¶¶42, 49, 61, 63, 65–67, 70–71, 73). On four occasions, Greenleaf attempts to dispute facts by raising legal arguments concerning the scope or particularity of Seneca's denials, or whether Seneca properly asserted certain affirmative defenses. (*Id.* ¶¶18–21, 23). And on two other occasions still, Greenleaf "denie[s]" facts "to the extent Seneca asserts the facts are undisputed," even though Seneca does not assert as much. (*Id.* ¶¶5–6).

As such, Greenleaf's response to Seneca's statement of material facts is inappropriate for multiple reasons. First, Greenleaf's denial of implications and assertions that Seneca does not make are, by definition, not responsive to the facts that Seneca *does* assert. *See Wilson v. Stewart*, 621 F.Supp.3d 900, 913 (N.D.Ill. 2022) ("If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact.") (cleaned up). Second, Greenleaf's disputes concerning Seneca's denials and affirmative defenses mirror arguments raised in their opposition to Seneca's motion for summary judgment, even though "it is well established that arguments belong in memoranda, not Rule 56.1 responses." *Ace Hardware Corp. v. Landen Hardware, LLC*, 883 F.Supp.2d 739, 742 (N.D.Ill. 2012); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); *Sys. Dev. Integration, LLC v. Comput. Sci. Corp.*, 739 F.Supp.2d 1063, 1068 (N.D.Ill. 2010). And third, Greenleaf's efforts to question the accuracy of deponents' testimony by highlighting testimonial discrepancies is merely "smoke" that "does not give rise to

a dispute of fact." *DiFranco v. City of Chicago*, 184 F.4th 987, 1000 (7th Cir. 2026). Such disputes "boil[] down to an argument that if the case went to trial, a jury might not believe [Seneca's] witnesses. But we have long rejected that line of argument as a basis for avoiding summary judgment." *DiFranco*, 184 F.4th at 1000. Indeed, to create a "genuine" issue of fact, an opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Without disputing that certain sworn testimony was given, or citing contrary evidence in the record that contradicts the sworn statements, Greenleaf's responses merely attack how certain statements should be interpreted. This is not a basis to dispute asserted factual statements that are properly supported with evidence.

For these reasons, the Court, in its discretion, deems admitted the properly supported asserted facts in Seneca's statement of facts for purposes of these summary judgment proceedings. *See, e.g.*, *Scott v. Town of Cicero*, No. 09 C 6128, 2012 WL 2072972, at *1 n.1 (N.D.Ill. June 6, 2012) (deeming facts admitted where responses, among other things, asserted that statements "accurately reflect[ed]" deposition testimony without introducing contrary evidence; tried to introduce additional facts into the process; wrongly asserted that the cited deposition did not say what the proponent asserted; and offered general denials without citing any supporting evidence).

## III. FACTUAL RECORD

The Court draws the factual record from the parties' pleadings; Seneca's statement of material facts ("DSOF") and its accompanying exhibits, (Dckt. ##65 and 65-1 to 65-9); Greenleaf's response to DSOF ("DSOF Resp.") and its accompanying exhibits, (Dckt. ##69 and 69-1 to 69-6); Greenleaf's statement of additional facts ("PSAF") and its accompanying exhibits,

(Dckt. ##70 and 70-1 to 70-4); and Seneca's response to PSAF ("PSAF Resp."), (Dckt. #72). The following facts are undisputed unless otherwise noted.

### A. The Property

Greenleaf, the named insured, owned the commercial property at 6948 N. Western Avenue in Chicago, Illinois (the "Property"), and the Property's coverage was provided by the insurance policy at issue in this case. (Dckt. #22 ¶7).

#### 1. The Tenancy

Greenleaf 401k Trust, LLC leased the Property to Grace Fajardo with an original lease period of February 11, 2021 to February 11, 2022, and a renewal period of February 11, 2022 to February 11, 2023. (DSOF ¶75). Greenleaf's lease with Fajardo did not allow for alterations, additions, or improvements in or to the premises without Greenleaf's prior written consent. (PSAF ¶2). But the renewed lease contained a section titled "SPECIAL AGREEMENT" with the following handwritten terms, (DSOF ¶77; Dckt. #65-9 at 2):

> Renovation (Rent Free) until May 31, 2021
> Rented in 'As is' Condition

Faizullah Khan, Dr. Khan's son, understood this provision to mean that Greenleaf was forgoing rent, and that the tenant would do renovations at their own expense to get their business started. (DSOF ¶78). Aprim Rasho, the property manager for the Property, was never notified by any tenant of damage or necessary repair to the insured building. (PSAF ¶6).

Following the start of the lease by Fajardo, neighbors lodged complaints with the City of Chicago and Alderman Silverstein reporting suspected drug dealing, prostitution, gambling, and shootings linked to the Property, as well as "vans of people" being brought to the location. (*Id.* ¶¶11, 31). On June 8, 2021, the City of Chicago Department of Business Affairs and Consumer Protection ("BACP") issued cease and desist orders to Fajardo for operating without a "liquor,

tavern license"; a "liquor, club license"; a "liquor, consumption on premises license"; a "liquor, retail food license"; a "liquor, tobacco license"; or a "public place of amusement license." (*Id.* ¶12). On October 13, 2021, BACP sent a letter to the Chicago Police Department about Fajardo's business license and complaints, and it requested that the police partner with BACP and the Department of Buildings to evaluate Fajardo's business at the Property. (*Id.* ¶13). Indeed, throughout 2021 and early 2022, both the BACP and the U.S. Department of Labor investigated Fajardo's business at the Property, which the BACP believed was related to Fajardo's businesses at other locations in the city. (*Id.* ¶¶13–16). Those locations were believed to be part of a suspected casino circuit and contained liquor and gambling machines. (*Id.* ¶¶15–19). The Chicago Police Department associated two shootings with the Property, one on September 17, 2021, and another on January 29, 2022. (*Id.* ¶20).

**2. Inspection and Demolition**

On February 8, 2022, the City of Chicago and federal law enforcement executed a search warrant on the Property. (DSOF ¶3). Around 4:30 p.m., a joint task force—comprising individuals with the U.S. Department of Labor, U.S. Department of Homeland Security, FBI, DEA, ICE, U.S. Postal Inspections, Illinois State Police, Chicago Police, Department of Buildings, Animal Control, and BACP—gained entry into the Property to execute a search warrant for investigating illegal narcotic sales, gambling operations, and fraud. (PSAF ¶22).

Ira Navarro, a supervising investigator for the BACP, was the BACP's on-site personnel for the February 8, 2022 search. Her report noted that the Chicago Police found "evidence of Prostitution activities"; arrested an individual named Jonina Cunanan for narcotics; and took certain items into evidence, including 300 rounds of ammunition, a liquor bar, gaming machines, poker chips and playing cards, drug paraphernalia, and "[n]arcotics including crystal like substances and flammable substances." (*Id.* ¶¶23–25).

Navarro's report also included the following conclusions from the Department of Buildings:

> The Dept. of Buildings . . . determined that the building was Dangerous & Hazardous due to the 1st Floor's joists and support beams being inadequate to support the Minimum Load of the 1st Floor. Due to this hazard and the possibility of a 1st floor collapse, the building has been ordered vacated and an Emergency Demolition Order has been initiated for wreckage of the structure to commence as early as tomorrow at 10AM (February 9, 2022).

(*Id.* ¶32).

The Chicago Department of Buildings noted the following in its February 8 inspection:

> Main center beam deflecting downward due to nonstructural supports with separation split running approximately 7 feet on undermined footing southeast corner of basement area has multiple floor joist pocketed into masonry that are resting on nonstructural wall northwest corner of basement has temporary nonstructural shoring These conditions are dangerous and hazardous to first responders. Multiple partitions building for living quarters on first floor and basement building without plans and permit with no second means of egress for living quarters in basement.

(DSOF ¶4; Dckt. #65-3 at 2). Mario Ficco, a Buildings Construction Inspector for the City of Chicago since 2016, conducted the inspection, and was the only person from the Department of Buildings to inspect the Property for structural issues. (DSOF ¶¶33, 35).

When Ficco was deposed for purposes of this lawsuit, he testified about the report he prepared and the photos that were taken during the February 8 inspection. (*See* Dckt. ##65-2 to 65-4). He described various structural issues that he characterized as construction defects, many of which were evident in the photos. (DSOF ¶50). He testified that one photo depicted a column, located in the basement to support the first level, that was deteriorated where it met with the floor. (*Id.* ¶37; DSOF Resp. ¶37; Dckt. #65-4 at 3). He testified that other photos depicted "temporary shoring" in the basement that was "not up to current city codes" in part because they lacked "proper footings," which would have been three to four feet of solid concrete with rebar upon which the columns could rest. (DSOF ¶38; Dckt. #65-4 at 3). And he testified that other photos still depicted joists—horizontal structural beams—resting on a nonstructural wall, which

were dangerous because any failure of the nonstructural wall could cause the floor to collapse. (DSOF ¶44–45).

Ficco also provided testimony describing the main center beam running across the ceiling of the basement. (*Id.* ¶¶40–43). In particular, he testified that the main center beam ceiling had deflection and was held up by temporary, non-structural "lally columns," without any permanent support columns. (*Id.* ¶¶40–41). He explained that the main center beam along the basement ceiling was deflecting downward "because the permanent supports had been removed, and someone put temporary ones in." (*Id.* ¶42) (cleaned up). And he testified that the center beam was "splitting due to the weight load above it . . . because there's nothing holding it up." (PSAF ¶35). As a result, Ficco explained, there was a possibility that the first-level floor could fall down due to the lack of structural support. (DSOF ¶43). He described this as a "serious issue" because "at any moment," the temporary columns could fail, "and the building could collapse." (*Id.* ¶41).

Ficco determined that the Property should be demolished based on his inspection. (*Id.* ¶46). While he reached this conclusion based on the totality of his findings, he emphasized that "the structural issues with the temporary shoring and those columns" were particularly serious factors creating "an imminent danger of collapse." (*Id.* ¶47). If there had been properly constructed permanent columns, he further testified, those columns would have been able to support the minimum load of the first floor. (*Id.* ¶¶48, 52). Indeed, the lack of a permanent supporting column for the basement ceiling's main center support beam was the "main issue" that Ficco brought up to Jorge Herrera, the Chief Demolition Inspector for the City of Chicago Department of Buildings, when Ficco submitted his inspection report. (*Id.* ¶59).

Ficco testified that the structural integrity of the building could have been maintained if the issues he identified had been addressed with proper construction techniques. (*Id.* ¶51).

When asked whether the main center beam was exhibiting deflection due to the weight of people or property, he testified, "I can't answer that question. I'm telling you that there was no proper permanent structure there, and it was deflecting due to it not being a permanent support." (*Id.* ¶53). Similarly, Herrera agreed that the issues identified in Ficco's report could have been addressed with proper construction techniques, and that construction defects or poor workmanship not up to code compromised the structural integrity of the Property. (*Id.* ¶¶60–61).

On February 9, 2022, the City of Chicago caused the Property to be demolished by Administrative Order pursuant to Section 14A-3.311 of the City of Chicago Municipal Code. (*Id.* ¶8; Dckt. #1-4 at 12). The Property was ordered to be demolished on an emergency basis based on the finding that the building constituted an actual and imminent danger to the public. (DSOF ¶64). The demolition cost $42,910, which Greenleaf is required to reimburse to the City of Chicago. (*Id.* ¶9).

Herrera testified that he spoke with the owner of the Property, Dr. Nasrullah Khan, over the phone, and that he was "almost certain" he did so before the building was demolished, and not after. (*Id.* ¶65; Dckt. #65-6 at 45:19–48:13). Herrera's "approach" was to speak with building owners to determine whether they knew about the problems the City identified, or whether they were proactive and willing to fix the problems they identified. (DSOF ¶66). Nonetheless, on February 9, 2022 at 6:22 p.m., Dr. Khan emailed Chicago Alderman Silverstein stating: "I am informed by a tenant that the above cited store is being demolished, and the work has started without any notice from the City or Alderman to the landlord. Please let me know the details of the reasons ASAP for further processing." (PSAF ¶9). Dr. Khan was 88 years old at the time, was suffering from early-stage dementia following a stroke, and had turned over property management to his son Faizullah Khan in 2020. (*Id.* ¶7).

Rasho, who was the property manager for the Property from 2012 or 2013 until the Property was demolished in February 2022, inspected the basement of the Property in 2019, 2020, and 2021. (DSOF ¶¶68–69; PSAF ¶3). Rasho testified that the first time he entered the building was in 2019, before the Property was rented to Fajardo. (DSOF ¶¶68–69). He also testified that each time he visited, the basement was a "big open space" with no vertical columns supporting the main center beam, and that no changes were made to the basement before Fajardo became the tenant in 2021. (Dckt. #65-7 at 32:6–33:5; DSOF ¶¶71, 73; PSAF ¶3). Yuvetta Bernard, who inspected the building for Seneca on June 3, 2020 "to assess current conditions for underwriting purposes," also noted that the basement was open and did not observe any support columns in the basement. (PSAF ¶3; PSAF Resp. ¶4). Finally, Faizullah Khan, who took over property management for Greenleaf and testified (in his individual capacity) for plaintiff, (PSAF ¶7), also testified that before the Property was rented to Fajardo, the basement was "completely open from one end to the other," (DSOF ¶79; PSAF ¶3).

**B. The Policy**

Seneca issued policy number CMP 4704470 (the "Policy") to Greenleaf as the named insured for the Property, with an initial policy period of February 27, 2020 to February 27, 2021, and a renewal policy period of February 27, 2021 to February 27, 2022 (together, the "Policy Period"). (DSOF ¶25; Dckt. #1-1 at 2). Greenleaf is claiming the entire building as its loss before the demolition. (DSOF ¶80).

The parties discuss the Building and Personal Property Coverage Form, the Commercial Property Conditions, the Causes of Loss – Special Form, and the Property Plus Enhancement Endorsement in connection with the Property's property coverage. (DSOF ¶¶26–31; PSAF ¶1; Dckt. ##1-1 and 1-2). They also discuss the Commercial General Liability Coverage Form in connection with the Policy's liability coverage. (DSOF ¶32; PSAF ¶1; Dckt. #1-1).

## IV. DISCUSSION

The parties agree that Illinois substantive law applies in this diversity case. *See, e.g.*, *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006) ("When a district court sits in diversity, it must apply the choice of law principles of the forum state to determine which state's substantive law governs the proceeding.").

Greenleaf brings a breach of contract claim seeking recovery for the Property up to the $200,000 coverage limit, plus inflation protection coverage, plus the $42,910 cost of demolition. (Dckt. #1 ¶31). Greenleaf also seeks a declaratory judgment stating that "collapse means a substantial impairment to the building's structural integrity without having to completely fall down." (*Id.* ¶42). Because the parties agree that the Policy unambiguously defines "collapse" to include loss of structural integrity, (*see* Dckt. #63 at 13), Greenleaf has waived its declaratory judgment claim, (*see* Dckt. #68 at 14), so the Court only considers Greenleaf's breach of contract claim.[1] For the reasons below, the Court finds that Seneca is entitled to summary judgment.

### A. The Policy Does Not Cover the Building's Collapse.

Seneca first argues that it is entitled to summary judgment because Greenleaf cannot establish a covered loss within the policy period. (Dckt. #64 at 2–5). Greenleaf contends that this argument should be barred, (Dckt. #68 at 2–3), and, in the alternative, that genuine questions of material fact preclude a finding that collapse occurred outside the Policy Period, (*id.* at 3–5). On both fronts, the Court disagrees.

[1] Greenleaf contends that the parties' agreement on this issue undermines Seneca's argument that certain exclusions foreclose coverage under the Policy. (Dckt. #68 at 14). This is not relevant, given the Court's findings below, and incorrect, because Seneca's contention that coverage was excluded was an alternative argument for why Greenleaf's purported losses are not covered by the Policy.

**1. Seneca Is Not Barred From Arguing That Collapse Preceded the Policy Coverage Period.**

As a preliminary matter, Seneca is not barred from raising its argument that collapse occurred outside the Policy Period.

Greenleaf contends that Seneca cannot argue pre-policy collapse for three reasons: (1) Seneca did not do so in its answer or affirmative defenses; (2) Seneca failed to deny with particularity that Greenleaf satisfied all conditions precedent to coverage; and (3) Seneca "repeatedly asserted" that Greenleaf's loss was caused by demolition, not collapse, which constituted "binding judicial admissions." (*Id.* at 3). Each of these arguments fails.

First, as the parties agree, Seneca denied in its answer that the building collapsed during the policy period. (*See* DSOF ¶18; Dckt. #22 ¶26).

Second, even if Seneca had not done so, "the existence of coverage is an essential element of the insured's case," not an affirmative defense like failure to perform conditions precedent, "and the insured has the burden of proving that his loss falls within the terms of his policy." *ABW Development, LLC v. Continental Casualty Co.*, 203 N.E.3d 922, 928 (Ill.App.Ct. 2022), *quoting St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 146 496 N.E.2d 1176, 1178 (Ill. 1986).

Third, and finally, the "binding judicial admissions" Greenleaf identifies include arguments from Seneca's motion to dismiss, (Dckt. #69-1), and Seneca's denial letters when Greenleaf initially filed claims, (Dckt. ##69-2 and 69-3), but no statements therein constituted judicial admissions. *See Neita v. City of* Chicago, 148 F.4th 916, 927 (7th Cir. 2025) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. . . . To be binding, a judicial admission must be a deliberate, clear, and unequivocal statement.") (cleaned up). Seneca's motion to dismiss does not

contain a judicial admission that collapse only occurred when the building was demolished because, while Seneca *primarily* discussed loss due to demolition, nowhere did it admit that demolition was the *only* source of loss or definition of collapse. And Seneca's denial letters do not contain such judicial admissions because (1) they are not pleadings and (2) Seneca expressly reserved all rights with respect to Greenleaf's claims. (Dckt. ##69-2 at 12; 69-3 at 12).

In sum: Greenleaf has failed to show that Seneca made a judicial admission that bars it from arguing that the Property collapsed outside the policy period.[2]

**2. The Undisputed Facts Show That a Collapse Occurred Outside the Policy Period.**

The Seneca Policy defines collapse to include the following: "(1) An abrupt falling down or caving in; (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in;" or "(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above." (DSOF ¶29). The parties agree that the Policy covers only those losses, including those due to collapse, that occurred within the Policy Period, which ran from February 27, 2020 to February 27, 2022. (*Id.* ¶¶25, 27). The Court thus considers whether a collapse occurred within the Policy Period, and finds that the undisputed facts show that one did not.

There is no dispute of material fact that the "main issue" with the building at 6948 N. Western Ave. was the lack of permanent columns supporting the main center beam in the basement. (*Id.* ¶59). The undisputed testimony from Chicago Department of Buildings inspector

---

[2] The cases Greenleaf cites to the contrary are inapposite. In *Manago v. Auto-Owners Insurance Co.*, unlike here, the defendant insurance company asserted an affirmative defense that the insured had not complied with all conditions precedent. No. 2:16-CV-267-RL-JEM, 2018 WL 1704465, at *2 (N.D.Ind. Apr. 9, 2018). And in *Peoria Property Investments LLC v. Cincinnati Indemnity Co.*, unlike here, the parties expressly *agreed* to certain facts about the cause of loss. No. 19-cv-1198-JES-TSH, 2021 WL 2598756, at *5 (C.D.Ill. Apr. 15, 2021).

Mario Ficco establishes that, as of Ficco's inspection on February 8, 2022, the main center beam was supported with only temporary lally columns that were not up to current city codes, (*id.* ¶¶38–40); that the lack of permanent columns was a "serious issue" and caused the main center beam to deflect downward, (*id.* ¶¶41–42, 53); that the lack of support for the main center beam could cause the floor to fall down, (*id.* ¶43); and that Ficco recommended that the building be demolished based on these findings from his inspection, (*id.* ¶46). What's more, Ficco testified that "the structural issues with the temporary shoring and those columns," in particular, made collapse "an imminent danger." (*Id.* ¶47).

Nor is there any dispute of material fact that, if there *had* been proper support columns in the basement, the structure could have supported the weight of the first floor. Both Ficco and his supervisor Herrera testified that construction defects or workmanship that were not up to code compromised the Property's structural integrity, and that if those issues had been properly addressed, the building could have supported the first floor. (*Id.* ¶¶50, 52, 60–61).

Finally, there is no dispute of material fact that support columns for the main center beam had not been present at least since 2019, when Rasho first entered the Property. In particular, Rasho testified that, in 2019, the basement was a big open space without supporting columns, (*id.* ¶¶70, 72); and that no changes were made to the basement before Fajardo became the tenant of the Property in 2021, when the basement was still a large open space with no columns holding up the ceiling, (*id.* ¶¶71, 73). As such, the record undisputedly shows that any removal of permanent support columns in the basement, and any ensuing loss of structural integrity of the building at 6948 N. Western Ave., occurred prior to Rasho's visit, placing such "collapse" outside the Policy Period.

Greenleaf's arguments to the contrary are unavailing. First, Greenleaf argues that Seneca's "pre-Policy loss theory" relies solely on Ficco's "speculat[ion] that permanent columns

had been removed," a statement that Ficco was unqualified to make and that "will not be admissible at trial." (Dckt. #68 at 3–4). But for the reasons described above, *see supra* Section II.B., Greenleaf's contentions that Ficco's statements are unreliable are insufficient to dispute Ficco's sworn deposition testimony. Ficco was not "speculating" that permanent columns had been removed; rather, he was describing their absence. Furthermore, his statement that an architect or engineer would need to determine the proper number and location of permanent columns does not make him unqualified to testify about the fact that he saw with his own eyes that there were no such columns in the basement. Greenleaf "may not merely recite the incantation, 'Credibility,'" and survive summary judgment. *Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989).

Second, Greenleaf argues that "the condition—not the absence of columns—led to" Ficco's recommendation to demolish the Property. (Dckt. #68 at 4). But this argument misconstrues Ficco's testimony, in which Ficco expressly stated that the "main issue" with the Property was the absence of permanent columns. (DSOF ¶59). The *fact* that the only supports present were temporary lally columns—and not, as Greenleaf contends, the *condition* of those temporary columns—was the reason that Ficco concluded the building was structurally unsound. (*Id.* ¶¶38–47; Dckt. #65-2 at 55:7–24, 59:8–15, 106:5–23, 154:8–12).

Finally, Greenleaf argues that the fact that no one had reported structural failure earlier—including Seneca inspector Yuvetta Bernard, property manager Rasho, or any tenant—creates a factual dispute that defeats summary judgment. (Dckt. #68 at 4–5). But the absence of complaints does not contradict the existence of structural failings at least at the time of Rasho's entry in 2019. Neither Bernard nor Rasho inspected the building for the purpose of identifying structural concerns. Bernard conducted her inspection in order to determine insurability; her report did not assert that she found no structural impairments. Indeed, to the contrary, her report

included the express disclaimer that it made "no representation nor . . . warrant[s] that buildings, premises, [or] locations . . . are completely safe, healthful, and/or are in compliance with every law, regulation or rule that might apply." (PSAF Resp. ¶¶3–4). And Rasho was merely a property manager who did not testify that he looked for structural impairments in the basement. (*Id.*).

Unlike in *WAM FAM5, Inc. v. Nova Casualty Insurance Co.*, the one case Greenleaf cites in support of its argument, here there is no material dispute about either the cause of the Property's collapse or whether the condition of the Property was impaired before or within the Policy Period. No. 15-1195, 2017 WL 1075069, at *7 (C.D.Ill. Mar. 21, 2017). Without citing evidence that would allow a reasonable juror to conclude that the Property did not lose structural integrity until some point in time within the Policy Period, Greenleaf cannot rely on unsupported speculation to support its breach of contract claim. *See Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044, at *3 (7th Cir. July 28, 2026) ("Mere speculation cannot defeat a motion for summary judgment."). As such, the Court finds that Seneca is entitled to summary judgment because no loss to the Property occurred within the Policy Period.

**B. The Policy Does Not Cover Demolition Costs.**

The parties agree that "loss by collapse here vested before the City-ordered demolition," and that "[t]he loss was total since the damage exceed[ed] coverage." (Dckt. #68 at 12). Thus, having found that the sole and total loss Greenleaf incurred happened outside the policy period, the Court separately considers whether Greenleaf is entitled to damages for the cost of demolition, and finds that it is not.

The parties discuss two relevant exclusions to property coverage in the Policy. The Ordinance Or Law exclusion specifies that Seneca "will not pay for loss or damage caused . . . [by] enforcement of or compliance with any ordinance or law . . . [r]equiring the tearing down of

any property, including the cost of removing its debris." (DSOF ¶28). The Governmental Action exclusion specifies that Seneca "will not pay for loss or damage caused . . . [by] destruction of property by order of governmental authority," except for losses "taken at the time of a fire to prevent its spread, if the fire would be covered." (*Id.* ¶28). Both of these exclusions apply "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (*Id.* ¶28).

Here, the parties agree that the City of Chicago demolished the Property on February 9, 2022 by Administrative Order from the Chicago Department of Buildings pursuant to Section 14A-3.311 of the City of Chicago Municipal Code. (*Id.* ¶8). That portion of the Chicago Municipal Code states the following:

> Where a *building*, *structure*, or *premises* has been damaged by fire, deterioration, or other cause, or shows clear evidence of structural failure, and where it constitutes an imminent danger to the public such that following the procedure in Section 14A-3-311.2 or 14A-3-312 is not practical, the *building official* is authorized to hire a licensed and qualified general contractor to immediately secure the *premises* and remove the dangerous *building* or *structure*.

Chi. Mun. Code §14A-3-311.3 (emphasis in original).

The Ordinance Or Law and Governmental Action exclusions unambiguously exclude losses such as the costs of the city-ordered demolition that Greenleaf incurred here, and Greenleaf does not argue otherwise. Instead, Greenleaf contends that it is entitled to coverage based on either (1) the Property Plus Enhancement Endorsement or (2) Coverage A of the Commercial General Liability Coverage Form. Neither of these provisions, however, provides coverage for Greenleaf's demolition costs.

The Property Plus Enhancement Endorsement contains a coverage extension for "Building Ordinance or Law" that states the following:

> **a.** If there is an ordinance or law in effect at the time of loss that regulates zoning, land use or construction of a covered building and if enforcement of that ordinance or law

> affects the repair or rebuilding of that building following damage by a Covered Cause of Loss, you may extend the insurance on Building to cover:
> (1) Costs to demolish and clear the site of the undamaged portions of the building;
> (2) The value of the undamaged portions of the building; and
> (3) The increased cost to repair or rebuild the building with another building of the same size.
>
> ***
>
> **c.** If you do not repair or replace the damaged building, we will pay under this Extension only to demolish and clear the site of the undamaged portions of the building.

(PSAF ¶1).

As Seneca correctly points out, the endorsement's coverage extension applies only to "[c]osts to demolish and clear the site of the *undamaged portions* of the building," or to cover the "value of the *undamaged portions* of the building." (PSAF ¶1) (emphasis added). Although Greenleaf asserts that "Seneca wrongly suggests that Plaintiff must prove some undamaged portions to trigger this coverage," it points to no text that shows that the policy endorsement is ambiguous or should be interpreted differently for any other reason—before again asserting that "the building was a total loss due to collapse *before* demolition." (Dckt. #68 at 12) (emphasis added). As such, Greenleaf fails to demonstrate how a reasonable juror could find that the policy endorsement provides coverage for demolition costs to the concededly damaged totality of the building.

Nor can Greenleaf rely on its liability coverage to recover demolition costs. That provision of the Policy reads as follows:

> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.
>
> **b.** This insurance applies to . . . "property damage" caused by an "occurrence" that takes place in the "coverage territory"

(DSOF ¶32; Dkct. #1-1 at 78).

"Occurrence" and "property damage" are defined in the Policy as follows:

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

***

17. "Property damage" means:
    a. Physical injury to tangible property, including all resulting loss of use of that property. . . . or
    b. Loss of use of tangible property that is not physically injured.

(DSOF ¶32; Dckt. #1-1 at 92).

The liability coverage portion of Seneca's Policy thus unambiguously provides coverage only for property damage caused by an "accident." Greenleaf argues that it seeks property damage caused by an "accident" because the relevant "occurrence" was "not the demolition, but the undiscovered property damage." (Dckt. #68 at 14). If this is the case, then the relevant "occurrence" fell outside the Policy Period (as explained above in Section IV.A.2.) and Greenleaf therefore cannot recover damages. If, on the other hand, the demolition itself was the relevant "occurrence," then it cannot plausibly be interpreted as an "accident" because it was completed pursuant to an Administrative Order.

Greenleaf puts forth no argument for why any "unexpected harm"—let alone, as at issue here, a city-ordered demolition completed pursuant to an Administrative Order—should constitute an "accident." Indeed, the demolition would not even constitute an "accident" under the definition set forth in the single case plaintiff cites. *See Acuity v. M/I Homes of Chicago, LLC*, 234 N.E.3d 97, 107 (Ill. 2023). In that case, the court concluded that the term "accident" in the policies at issue encompassed "unintended and unexpected harm caused by negligent conduct," consistent with language concerning construction defects in other policies. *Id.* Here, Greenleaf does not argue, and the record would not support a reasonable conclusion, that the demolition order constituted "negligent" conduct. As such, Greenleaf fails to demonstrate how a reasonable juror could conclude that Greenleaf is entitled to demolition costs based on its liability coverage.

The Court thus grants summary judgment in favor of Seneca.

## CONCLUSION

For the foregoing reasons, Seneca's motion for summary judgment, (Dckt. #63), is granted.

**DATE: October 16, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**